# 25-1582

**UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT**

_____

**Joshua Cleaveland,**
    *Plaintiff - Appellant,*
**v.**
**Home Depot USA, Inc., Tricam Industries, Inc.,**
    *Defendants - Appellees.*

_____

**On Appeal from the U.S. District Court
for the District of Connecticut**

**BRIEF OF PLAINTIFF-APPELLANT
JOSHUA CLEAVELAND**

**Jack G. Steigelfest
Howard, Kohn, Sprague & FitzGerald LLP
237 Buckingham Street
Post Office Box 261798
Hartford, Connecticut 06126-1798
(860) 525-3101
jgs@hksflaw.com**

**Counsel for Plaintiff-Appellant**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Background Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Facts Relating to Incident. . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  Expert Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.  Motions and District Court Rulings . . . . . . . . . . . . . . . . . . . . 18

      A.    Motion for Permission to File Supplemental
           Expert's Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Motion to Exclude Testimony of Jonathan Slocum. . . . . . . 22

      C.    Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . 24

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

I.    Because the exclusion of Dr. Slocum's testimony without
      supplementation was outcome-determinative and the
      district court did not adequately consider alternatives,
      the order denying the Motion for Permission to File
      Supplemental Expert's Report is not justified. . . . . . . . . . . . . 32

**II.**     **Because Dr. Slocum employed a reliable methodology and that methodology was properly applied to the facts of this case, the order excluding his testimony in its entirety was not justified and must be reversed.** . . . . . . . . . . . . 39

        **A.**     **The District Court erred in holding that Dr. Slocum's methodology for investigating the accident cause and the reliability of his opinions were insufficient.** . . . . . . . . 40

        **B.**     **Putting aside the admissibility of Dr. Slocum's opinion regarding the cause of the accident, there was no basis for the district court's order precluding Dr. Slocum's testimony in its entirety, where some of that disclosed testimony was adequate on the question of reasonable alternative design.** . . . . . . . . . . . . 46

**III.**     **Because Mr. Cleaveland provided a sufficient basis for a jury to find in his favor, the District Court erred in granting summary judgment in favor of the defendants.** . . . . . 50

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**Unpublished cases**

ii

## TABLE OF AUTHORITIES

**CASES**

*Abascal v. Fleckenstein*, 820 F.3d 561 (2d Cir. 2016) . . . . . . . . . . . . .  39

*Allstate Ins. Co. v. Gonyo*, No. CIV 807-CV-1011 RFT,
    2009 WL 1212481 (N.D.N.Y. Apr. 30, 2009). . . . . . . . . . . . . . .  41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505,
    91 L. Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bagley v. Adel Wiggins Group*, 327 Conn. 89,
    171 A.3d 432 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Bifolck v. Philip Morris, Inc.*, 324 Conn. 402,
    152 A.3d 1183 (2016). . . . . . . . . . . . . . . . . . . . . .  28, 29, 51-52

*Byrne v. Comm'r*, 509 F. App'x 33 (2d Cir. 2013) . . . . . . . . . . . . . . . 35

*Cleaveland v. Home Depot USA, Inc.*, – F. Supp.2d –,
    2025 WL 1640246 (D. Conn. 6/10/2025) (on appeal) . . . . . . . . . . . 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,
    113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) . . . . . . . . . . . . . . . . . . 40

*Dodson v. Runyon*, 86 F.3d 37 (2d Cir.1996). . . . . . . . . . . . . . . . . . 35

*Fajardo v. Boston Sci. Corp.*, 341 Conn. 535,
    267 A.3d 691 (2021). . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85 (2d Cir. 2000) . . . . . . 45

*In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016). . . . . . . . . . . 48

*CASES (cont.)*

*Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172,
    136 A.3d 1232 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . 26-28, 51, 53

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
    845 F.2d 1172 (2d Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kozar v. Sharp Elecs. Corp.*, No. CIV.A. 04-901,
    2005 WL 2456227 (W.D. Pa. Sept. 30, 2005) . . . . . . . . . . . . . . . 41

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167,
    143 L. Ed. 2d 238 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995). . . . . . . . . . 40

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988). . . . . . . . . . . 34

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) . . . . . . . . . . . . . 21

*Pichardo v. C.R. Bard, Inc.*, 563 F. App'x 58 (2d Cir. 2014) . . . . . . . . . 33

*Proctor v. LeClaire*, 846 F.3d 597 (2d Cir. 2017) . . . . . . . . . . . . . . 50, 52

*S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867 (2d Cir. 2021) . . . . . 53

*Salahuddin v. Harris*, 782 F.2d 1127 (2d Cir.1986) . . . . . . . . . . . . . . 35

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir.1999). . . . . . . . . . . 39

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Conde*, 134 F.4th 82 (2d Cir. 2025) . . . . . . . . . . . . . 39

*CASES (cont.)*

*United States v. Robinson*, 544 F.2d 611 (2d Cir. 1976),
    on reh'g, 560 F.2d 507 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . 37

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
    694 F.3d 155 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-35


**STATUTES**

**28 U.S.C. §1291** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**28 U.S.C. §1332(a)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Connecticut General Statutes §52-572m** . . . . . . . . . . . . . . . . . . . 3


**RULES**

**Fed. R. Civ. Pro. 26(e)(1)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Fed. R. App. Pro. 4(a)(1)(A)** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Fed. R. Evidence 702** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

**Fed. R. Evidence 703** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45


**OTHER AUTHORITIES**

**NFPA 921-2017, Chapter 4** . . . . . . . . . . . . . . . . . . . . . . . 12, 23, 41

**Restatement (Second) of Torts §402A** . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this action based on 28 U.S.C. §1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

This Court has appellate jurisdiction under 28 U.S.C. §1291 because the district court's order granting summary judgment in favor of the defendants is a final decision filed on June 10, 2025. Joshua Cleaveland timely filed his notice of appeal on June 25, 2025. FED. R. APP. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)     Because the exclusion of Dr. Slocum's testimony without supplementation was outcome-determinative and the district court did not adequately consider alternatives, the order denying the Motion for Permission to File Supplemental Expert's Report is not justified and must be reversed.

(2)     Because Dr. Slocum employed a reliable methodology and that methodology was properly applied to the facts of this case, the

1

order excluding his testimony in its entirety was not justified and must be reversed.

(3)    Because Mr. Cleaveland provided a sufficient basis for a jury to find in his favor, the District Court erred in granting summary judgment in favor of the defendants.

## STATEMENT OF THE CASE

The plaintiff Joshua Cleaveland pursues this action against the defendants Tricam Industries, Inc. and Home Depot USA Inc. seeking money damages in compensation for injuries sustained when a ladder manufactured and sold by the defendants failed, causing Mr. Cleaveland to fall to the ground. Mr. Cleaveland further sought punitive damages and attorney fees. The Honorable Sarala Nagala, USDJ, entered orders (1) denying Mr. Cleaveland's motion to supplement his expert disclosure, (2) excluding expert testimony from Mr. Cleaveland's disclosed liability expert, and (3) granting summary judgment in favor of the defendants. The orders excluding expert testimony and granting summary judgment are found at *Cleaveland v.*

*Home Depot USA, Inc.*, – F. Supp.2d –, 2025 WL 1640246 (D. Conn. 6/10/2025).

I.     **Background Facts**

Joshua Cleaveland initiated this action by Complaint filed in the Connecticut Superior Court. JA 18. In that Complaint, Mr. Cleaveland alleged that he purchased a Gorilla-brand ladder manufactured by Tricam Industries, Inc. at Home Depot in May of 2021. JA 19. He further alleges that on August 26, 2021, the ladder buckled from beneath him as he was using it to repair siding on his home, causing him to fall to the ground. Id. Mr. Cleaveland plead claims under the Connecticut Products Liability Act, General Statutes §52-572m et seq. based on defective design and/or manufacture of the ladder, including theories of strict products liability, negligence and breach of warranty, as well as reckless disregard for the safety of users and consumers. JA 20-27.

After the defendants removed the case to the federal district court on October 5, 2023; JA 11; Judge Nagala entered a Scheduling Order adopting certain deadlines suggested in the Parties' Rule 26(f) Report.

JA 37. The Scheduling Order included a deadline for designation of trial experts and exchange of reports from retained experts on issues on which a party bears the burden of proof by February 15, 2024, with depositions of those experts by April 15, 2024. The Scheduling Order further set a deadline of June 15, 2024 for designation of experts and exchange of reports from retained experts on issues on which a party does not bear the burden of proof, with depositions of those experts by August 15, 2024. The Scheduling Order set a discovery cut off of October 7, 2024, and a deadline of November 7, 2024 for the filing of any motion for summary judgment and any motion to preclude expert testimony. JA 38-39.

## II.    Facts Relating to Incident

The only version of the facts of the incident was provided by Mr. Cleaveland. As documented in his deposition transcript, presented to the District Court as an Exhibit to the defendants' Motion for Summary Judgment; JA 88; Mr. Cleaveland testified that he purchased the Gorilla-brand ladder from the Home Depot store on May 5, 2021. JA 91. As he weighed 242 pounds at the time, he specifically chose the ladder he bought, which was represented to have a 300 pound weight limit,

4

rather than different ladder with only a 250 pound rating. JA 92. He had used the ladder on perhaps 5 occasions prior to the loss, and previously was up and down it without incident perhaps 20-25 times. JA 92-93.

Mr. Cleaveland placed the ladder in the back of his house on a concrete slab with the intention of using it to access aluminum siding he wanted to secure to the house. JA 94-95. He climbed up to the top step of the ladder, and was reaching up and about 1-2 feet to his left; JA 95-97; when he felt something and starting falling backwards. JA 97. The ladder went toward the house and bounced back before falling to the right. JA 97-98.

III.   Expert Disclosures

Appended to the defendants Motion to Exclude Testimony of Jonathan Slocum is a copy of Dr. Slocum's April 6, 2022 report, curriculum vitae, and list of depositions. JA 66-77. Mr. Cleaveland's actual disclosure of Dr. Slocum is not in the record.

Jonathan Slocum's CV reveals that he has bachelor's, master's, and doctoral degrees in Mechanical Engineering from the Massachusetts Institute of Technology, receiving his doctorate in 2018.

5

JA 72. After graduation, he stayed on as a Research Affiliate at MIT, while also continuing work at Materials and Engineering Group as a senior consultant in forensic and design consulting and failure analysis, and engaging in other projects. After leaving Materials and Engineering Group in 2022, he founded his own expert consulting business, Slocum Consulting Group, LLC. He has received design awards for his inventions and thesis research and has worked, through LTAG Systems, to develop technology and devices for the Department of Defense. JA 72-76.

Dr. Slocum's Preliminary Report is dated April 6, 2022. JA 66. In it, Dr. Slocum reports that he visually inspected the incident ladder and purchased and reviewed an exemplar ladder of the same model. He further provides an Incident Summary consistent with Mr. Cleaveland's deposition testimony. Id. He provides an annotated photograph explaining the various parts of the ladder:



**Figure 1 -** Incident 5.5ft. Gorilla Ladder that collapsed under Mr. Cleaveland causing him to fall and be injured.

**JA 67. Dr. Slocum measured the wall thickness of the cross section. Id.**

**From comparison of the incident ladder with the exemplar, he found that the rear rail extrusion of the incident ladder was deformed around the spreader-link pin-joint. JA 66-67. He provided a photograph of that deformation as well:**

7



**Figure 2-** The rear-left rail extrusion that the spreader-link pin-joint passes through is deformed inwards relative to the rest of the extrusion face, which is likely the result of manufacturing or assembly.

**JA 68.**

Based on his investigation and analysis, Dr. Slocum's report listed the following Findings and Summary of Evidence:

1. The incident ladder (Figure 1) has a rear-left rail that has buckled inwards towards the front rails. The buckling of the rear-left rail is localized to the pin joint for the spreader link. The smooth wavy shape of the

8

bent metal around the pin joint is indicative of plate buckling of the thin-walled extrusion that forms the rail.

2.     The height of the extrusion is about 1.5" so the height/wall thickness ratio is about 40:1 which means the plate-like sections that form the walls of the rail may be prone to buckling failure. In addition, this ratio means the extrusion walls may be sensitive to deformation from a drilling or riveting operation if great care is not taken. For example, a dull tool or the tool pushed too hard and fast could cause the material to bend and deform before it was cut. In addition, installation of the rivet could also cause or exacerbate the type of deformation seen below [referencing Figure 2.

3.     When a user's weight is on either of the top two steps of the Gorilla ladder, the spreader link and bottom step will apply a side load to the front and rear rails. The rotating steps of the Gorilla Ladder automatically deploy and stow away when the ladder is opened and closed. The bottom step acts as one of the spreader links, and the top step is connected to the bottom step via a connecting link. The connecting link allows the steps to form a parallelogram or a 4-bar linkage with each other. When a user opens the ladder, the top and bottom steps rotate to a deployed position, and the ladder is fully deployed when the top step hits the horizontal brace. When a user stands on the top or bottom step, some of the load is transferred through the horizontal brace to the rails, however another fraction of the load is also distributed to the spreader links. Regular stip ladders do not have this significant side load on the rails as the steps are usually fixed to the front rails and independent of the spreader links.

9

4.  When a rectangular metal tube fails in uniform compressive plate buckling, the sides of the tube will form symmetric waves bulging both inwards and outwards as shown in Figure 3a. The rear rail extrusion that failed shows only local plate buckling on one side of the rail that looks similar to the buckled shape in 3a. The outside portion of the rear rail is unbuckled, indicating that a side load must have been applied on the pin joint of the rear rail, which generated a moment on the rear rail, where the outside face was in tension, and the inside face was in compression and buckled.

This side load was likely due in part because of Mr. Cleaveland standing on the top step and reaching to his left which resulted in a higher load on the rear left rail than the rear right rail. Normal tolerance with this design can lead the top step not being fully supported by the left rear rail and some load being transmitted down the connecting link to the spreader link. The connecting link would thus transmit some of his weight to the spreader link and bottom step, causing the spreader link to push further outwards on the rails and induce the buckling failure seen. Normal manufacturing tolerances mean that the spreader link can either be upwards bent slightly, exactly straight, or downwards bent slightly when the ladder is deployed. The most likely state is either slightly bent up or down cases, and given finite stiffness of elements, when a user stands on the top step, the step and its support will deform. When combined with normal tolerances, these states cause the connecting link to exacerbate the slight bend in the spreader links and thus either way cause a side load to be imposed on the rear rail. In this regards, the design is inherently prone to failure.

10

> **Since the spreader link is also applying an eccentric load (a load that is not through the center of stiffness of the object), it will also be applying torsion to the tube, which would add to the overall stress it experiences when loaded**
>
> **Furthermore, the hole for the pin-joint on the rear rail creates a stress concentration in the structure and the region should have been reinforced before the rivet was inserted and assembled. Figure 3b shows a buckled shape similar to 3a, and the material around the rivet buckled inwards following the direction of deformation shown in Figure 2. It is more likely than not the pre-deformed state of the extrusion shown in Figure 2 also contributed to the premature buckling of the ladder.**

**JA 67-69.**

Based on these findings, Dr. Slocum concluded that the ladder is inherently prone to failure (defective) because the design of the top and bottom steps of the ladder, combined with the deformed extrusion and stress concentration from the pin-joint hole, contributed to premature buckling of the structure below its rated load limit of 300 lbs. JA 70. He further opined that the pin-joint area of the linkage connection to the rails should have been reinforced to prevent local plate buckling and that additional reinforcement would likely have prevented this accident from occurring. Id.

Dr. Slocum's Report indicates that his investigation was carried out in a manner consistent with the scientific method as outlined in NFPA 921-2017, Chapter 4. JA 66.

In response to the disclosure of Dr. Slocum, Tricam Industries and Home Depot disclosed Jon Ver Halen, P.E. as their liability expert. Mr. Ver Halen confirms that the left rear side rail of the ladder has buckled at the level of the attachment to the spreader/1st platform. JA 61.

However, Mr. Ver Halen opines (1) that the ladder was designed and constructed consistent with ANSI A14.2-2017, with a significant safety factor and would not have failed under the conditions described by Mr. Cleaveland, (2) that the report of Dr. Slocum lacks scientific validity, because it contains numerous unproven hypotheses without testing or calculations to prove the validity of those hypotheses, and (3) that the deformations found in the ladder were inconsistent with the accident as described by Mr. Cleaveland because (a) the forces at work would have been in the opposite direction of the bend actually found in the ladder and (b) the ladder would have to be lifted or the rail would have to dig a trench through the ground, neither of which conditions

12

were present at the time of the subject accident. JA 63. In support of his opinion regarding the forces at work on the ladder, Mr. Ver Halen provided a free force diagram as follows:



Free Body Diagram          Expected Direction of Deformation          Subject Ladder Deformation

JA 65.

In the parties' Joint Status Report of October 14, 2024, Tricam Industries and Home Depot reported their intention to file a motion for summary judgment and a motion to exclude Dr. Slocum's testimony. JA 43. Mr. Cleaveland reported that Dr. Slocum was in the process of preparing a supplemental report in response to the testimony of Mr. Ver Halen. JA 44. Tricam Industries and Home Depot responded that they would be objecting to any supplemental report as untimely, as Mr.

13

Ver Halen was disclosed June 14 2024, his deposition was taken July 22, 2024, expert discovery closed August 17, 2024, and all discovery closed pursuant to the existing scheduling order on October 7, 2024. Id.

On November 7, 2024, Tricam Industries and Home Depot filed their Motions to Exclude Testimony of Jonathan Slocum and for Summary Judgment with respect to the claims of Mr. Cleaveland. JA 45 & JA 78. On the same day, Mr. Cleaveland filed his Motion for Permission to file Supplemental Expert's Report. JA 128. A copy of Dr. Slocum's November 7, 2024 Gorilla Ladder Failure Rebuttal Report is appended to Mr. Cleaveland's Memorandum in Opposition to Exclude Dr. Slocum's testimony. JA 172-81.

In his Rebuttal Report, Dr. Slocum first takes issue with Mr. Ver Halen's claim that the forces at work would have been in the opposite direction of the bend actually found in the ladder. Dr. Slocum states that Mr. Ver Halen's force diagram is wrong and incomplete in describing the forces at work in this accident. Dr. Slocum provides his own free body diagram showing those forces:



**Figure 1** - Free body diagram of the Gorilla ladder.

**JA 173. Dr. Slocum then shows calculations based on the established engineering principles discussed in his Preliminary Report regarding the direction of force on the ladder at the time of the incident supporting his original statements and refuting the erroneous diagram provided by Mr. Ver Halen. JA 174-76. Dr. Slocum's opinion on this subject is not new, as he writes:**

> Thus, as I opined upon in the preliminary report, this spreader link is acting as a knuckle linkage to deform the rails outwards since the feet of the ladder cannot move outwards on the floor when deployed and loaded. This horizontal force applies a bending moment on the rear rail, which predisposes it to buckling.

JA 176. Dr. Slocum then conducted a simple test to demonstrate the validity of his opinion, using a straight edge to show the direction of force on the rear rail when the ladder is loaded. JA 177-78. He points out that the stress is imposed on the area of the ladder that failed, observing

> This compressive stress is further increased due to the hole created in the rear-rail for the spreader link rivet. This hole is a stress concentration area and is completely un-reinforced and as I have shown in my previous report. I showed how the aluminum tubing on the exemplar ladder is deformed inwards around the hole due as a result of manufacturing.

JA 179.

Dr. Slocum also disputes Mr. Ver Halen's reliance on satisfaction of ANSI and OSHA test requirements. Again, Dr. Slocum refers back to his Preliminary Report in support of his opinion that manufacturing variability, particularly with riveting and drilling operations used to create the joint between the rear rail and the spreader link, are not

16

accounted for in the prior testing. He observes:

> I have already shown in my prior report the damage due to these operations on the exemplar ladder I have purchased. Pre-deforming a column in this manner is consistent with it's eventual buckled shape as shown above (note how the material is deformed inwards from the rivet). This greatly weakens the rail's buckling strength. Furthermore, it is well known in structural engineering that adding a bending moment to a column under compressive load can be dangerous, as it will reduce the buckling strength of the column.

JA 180.

Dr. Slocum's Rebuttal Report includes two conclusions, specifically,

1. The incident ladder failed due to buckling of the rear left rail because of an internal moment created by both the spreader link pushing on the rear rail and the top step loading the horizontal brace. The hole created in the rear rails for the spreader link rivet weakened the rails, resulting in a stress concentration. This stress concentration exacerbated the already asymmetric compressive bending stress experienced by the rear left rail, causing the rail to locally buckle on the inside surface at the location of riveted hole. Furthermore, manufacturing of the riveted hole deformed the aluminum tubing inwards, which is consistent with the buckled shape shown in **Figure** 7. Had Gorilla properly designed the rear rails to handle an applied bending moment and reinforced the spreader link rivet hole, this failure would not have occurred. It is more likely than not that the incident ladder had a manufacturing defect from the manufacturing of the

17

rivet hole in the rear left rail that weakened the rail to a point where the ladder failed well below its rated weight limit.

2. Mr. Ver Halen's analysis and understanding of this ladder is inherently wrong in part due to his free-body diagram being wrong. He completely ignores the effect of static friction which prevents the foot of the rail from moving with respect to the ground, which is critical to understanding how this ladder failure occurred. My analysis supports how the failure occurred and how the rear leg was deformed inwards due to the buckling of the rear left rail.

JA 181.

## IV. Motions and District Court Rulings

### A. Motion for Permission to File Supplemental Expert's Report

In Mr. Cleaveland's Motion for Permission to File Supplemental Expert's Report, Mr. Cleaveland notes that his expert has prepared a supplemental report, which has been forwarded to defense counsel. Mr. Cleaveland offers to make Dr. Slocum available to be deposed at a mutually convenient time and notes that the case has not yet been assigned for trial. JA 128. The defendants' filed a Response to the Motion, arguing that it should be denied. JA 130.

In Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Permission to Serve Supplemental Expert Report; JA 198; Mr.

18

Cleaveland first establishes that his initial disclosure of Dr. Slocum was not late; evidence established that counsel for the defendants agreed to a brief extension of the deadline and the court had earlier suggested that counsel work out discovery issues if possible. JA 199.

Mr. Cleaveland further provides an explanation for the timing of disclosure of the Rebuttal Report. Mr. Ver Halen was deposed on July 22, 2024; the transcript of his deposition was received on August 1, 2024 and sent to Dr. Slocum on August 6, 2024. Dr. Slocum provided his Rebuttal Report on November 7, 2024, and it was disclosed immediately. JA 201. Both defense counsel and the court were on notice that a rebuttal report was anticipated. JA 44. Dr. Slocum has provided an affidavit explaining that he timely received the deposition transcript and that his delay in providing the Rebuttal Report was due to his inability to complete the work necessary for the Rebuttal Report earlier due to other commitments. JA 157.

Mr. Cleaveland further observed that the Rebuttal Report both rebuts the opinions of Mr. Ver Halen and buttresses the earlier opinions of Dr. Slocum and that failure to permit the Rebuttal Report would severely prejudice his ability to prove his case persuasively. JA

19

202-3. Recognizing that the Dr. Slocum's Rebuttal Report prejudices the defendants, in the sense that it is adverse to their position, Mr. Cleaveland observed that any unfair prejudice could be cured by a deposition of Dr. Slocum, which the defendants has previously foregone, or a review of his Rebuttal Report by the defendants' own expert. Finally, Mr. Cleaveland observed that the lawsuit had been filed in state superior court on August 30, 2023 and removed to the federal district court on or about October 5, 2023. Mr. Cleaveland pointed out that the disclosure of an expert rebuttal opinion in a product liability case on November 7, 2024 does not suggest any delay in the prosecution of the case, no trial date had ever been set, and discovery had only been closed for two months. Mr. Cleaveland suggested a brief continuance to address any prejudice from acceptance of the Rebuttal Report. JA 203-4.

On December 26, 2024, the District Court issued its order denying Mr. Cleaveland's Motion for Permission to File Supplemental Expert's Report. JA 208-9. In her order, Judge Nagala observed that the defendants had not deposed Dr. Slocum in response to his disclosure by Mr. Cleaveland. Judge Nagala further observed that Mr. Cleaveland

20

disclosed Dr. Slocum's Rebuttal Report the same day it was received, on November 7, 2024. This was three months after the close of expert discovery and one month after the close of all discovery.

In ruling on the Motion, Judge Nagala employed a four-part test, focusing the following factors:

> "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997); see also *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

JA 208.

Initially, Judge Nagala wrote that the first factor weighs most heavily against Mr. Cleaveland, because (1) the explanation for the late disclosure was contained in a reply memorandum rather than the original motion, and (2) the explanation did not address when Mr. Cleaveland learned of the need for a rebuttal and why a more timely motion to file one was not made. Id. As to the second factor, Judge Nagala acknowledged that the Rebuttal Report appears to address issues that require expert testimony and are central to the case. JA

21

209. Judge Nagala found that the third factor favored the defendants, because the remedies proposed by Mr. Cleaveland to neutralize any prejudice to the defendants, namely giving the defendants an opportunity to depose Dr. Slocum and to respond to his Rebuttal Report, were insufficient because discovery had closed and the defendants had already filed their motion for summary judgment. Id. As to the possibility of a continuance, Judge Nagala recognized that a trial had not yet been scheduled, but nevertheless held that allowing time to depose and rebut Dr. Slocum's Rebuttal Report, and supplement the motion for summary judgment, would cause an undefined delay in trial scheduling. Id.

B.    Motion to Exclude Testimony of Jonathan Slocum

In their Motion to Exclude Testimony of Jonathan Slocum, the defendants argued: (1) that Dr. Slocum is unqualified to opine on issues of ladder defect or causation, (2) that Dr. Slocum employed no methodology, much less a scientifically reliable one, (3) that Dr. Slocum did not conduct any background research, testing, or measurements, (4) that Dr. Slocum did not seek peer review of his theory, (5) that Dr. Slocum did not, and could not, calculate an error rate for his theories,

22

and (6) that Dr. Slocum's purely visual inspection without any testing is not a generally accepted method of determining defect or causation in the scientific community. JA45-46.

As part of his response, Mr. Cleaveland supplemented the record with Dr. Slocum's Affidavit. JA 152. In his Affidavit, Dr. Slocum (1) explained his qualifications to opine regarding the mechanical structure of this product, (2) explained, as set forth in his Preliminary Report, that he had employed the scientific method as described in NFPA 921-2017, Chapter 4 in reaching his opinions, (3) that he did measurements, obtained an exemplar ladder to review, researched existing ladders, and prepared a labeled diagram to refer to in his report, (4) that his report had been peer reviewed by Dr. Alex Slocum, a tenured professor of mechanical engineering at MIT, (5) that he did not calculate an error rate for his analysis and conclusions because it is irrelevant to this case, and (6) that, in the context of a failed and deformed ladder, visual inspection and measurement, along with comparison to an exemplar, was a proper way to validate the conditions that led to failure of the ladder. JA 154-57. He further pointed out that his additional work in response to the erroneous opinions of Mr. Ver

Halen further validated his original opinions. JA 156. Mr. Cleaveland further provided copies of Dr. Slocum's CV, Preliminary Report, and Rebuttal Report. JA 158-81.

In its Ruling on Defendants' Motion to Exclude Expert Testimony and Motion for Summary Judgment; SA 3; the Court first found that Dr. Slocum is qualified to render expert opinions regarding the ladder's alleged manufacturing and design defects. SA 13-14. However, Judge Nagala went on to hold that visual inspection alone was not a reliable methodology for assessing a ladder accident, ignoring that Dr. Slocum did more than just look at the damaged ladder and rejecting Dr. Slocum's sworn statement, in the absence of contrary evidence, that he undertook a reliable and scientific approach to his investigation. SA 14-16. Judge Nagala went on to conclude that even if the methodology was reliable, there was too great an analytical gap between his data and the opinion proffered. SA 16-17. Judge Nagala faulted an asserted lack of explanation, data, and testing to support Dr. Slocum's opinions.

C.    Motion for Summary Judgment

The defendants moved for summary judgment as to the entirety of Mr. Cleaveland's Complaint. JA 78. Mr. Cleaveland objected, providing

24

both of Dr. Slocum's reports with an affidavit from Dr. Slocum mirroring those reports. JA 210-64. The District Court Judge found no evidence to create a genuine issue of material fact regarding any manufacturing defect claim. SA 22-23.

The Court further concluded that expert testimony is required regarding an alternate design under the risk-utility test for strict liability and, given the exclusion of Dr. Slocum's testimony, Mr. Cleaveland cannot prove his case. SA 24. The Court added, moreover, that even if Mr. Slocum's Preliminary Report and Affidavit were considered, his opinion regarding reinforcement of the pin-hip area of the linkage connection to the rails as an alternate design was insufficient. SA 24-25.

The Court further found that, given the exclusion of Dr. Slocum's testimony, Mr. Cleaveland cannot raise a triable fact to establish that the ladder's design was manifestly unreasonable. SA 25. Judge Nagala added that she would reach the same conclusion even if she considered Dr. Slocum's Preliminary Report because that report does not address the factors relevant to the determination of manifest unreasonableness, and Dr. Slocum did not test whether the exemplar ladder would buckle

25

in the same way as the accident ladder. SA 25-26, The Court distinguished Dr. Slocum's Rebuttal Report, which the Court recognized does address this issue. SA 26 n.6.

The District Court also rejected use of the consumer expectation test, because it found no admissible evidence that the ladder would fail to meet minimum safety expectations and Mr. Cleaveland's argument required expert testimony, which had been precluded. SA27-28.

Finally, the District Court found that, in the absence of expert testimony, Mr. Cleaveland could not raise a jury question in support of his claim of breach of the implied warranty of merchantability. SA 28-29. The Court added that even if it considered Dr. Slocum's opinions, they amount only to the fact that an accident happened and do not establish a defect or that the manufacturer is responsible.

## SUMMARY OF THE ARGUMENT

Connecticut law has derived the elements of a strict product liability claim from §402A of the Restatement (Second) of Torts. *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 184, 136 A.3d

1232, 1239 (2016). Those elements are:

> (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.

*Izzarelli*, 321 Conn. at 184–85, 136 A.3d at 1239 (citation and quotation marks omitted). In this case, the District Court granted summary judgment on the basis that Mr. Cleaveland had failed to raise a triable question of fact as to the second element, whether the ladder was in a defective condition unreasonably dangerous to Mr. Cleaveland as a consumer or user.

In *Izzarelli*, the Connecticut Supreme Court clarified that, in most product liability cases, the plaintiff is required to establish a defective design under the "modified consumer expectation test", pursuant to which "the jury would weigh the product's risks and utility and then inquire, in light of those factors, whether a reasonable consumer would consider the product design unreasonably dangerous." (Internal quotation marks omitted.) *Id.*, at 190, 194. By contrast, the so-called

27

"ordinary consumer expectation test," under which, to be considered unreasonably dangerous, the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, "would be appropriate [only] when the incident causing injury is so bizarre or unusual that the jury would not need expert testimony to conclude that the product failed to meet the consumer's expectations." *Id.*, at 191.

In applying the risk-utility test, the availability of a feasible alternative design "is a factor that a plaintiff may, rather than must, prove in order to establish that a product's risks outweigh its utility." *Id.*, at 190–91, 208–10.

> [I]n Connecticut, unlike in some states and in accordance with the position of the Restatement (Third) of Torts, Products Liability, proof of a reasonable alternative design is not necessary to prove that a product has a defective design. It is only one way of proving defective design.

*Fajardo v. Boston Sci. Corp.*, 341 Conn. 535, 569, 267 A.3d 691, 712 (2021).

In *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 152 A.3d 1183

(2016), the Connecticut Supreme Court further clarified *Izzarelli's* ordinary and modified consumer expectation tests. First, the Court renamed them the "consumer expectation test" and the "risk-utility test," respectively. *Bifolck*, 324 Conn. at 432. Second, the Court set forth two distinct prongs or methods by which the risk-utility test may be satisfied.

> Under the risk-utility test, which will govern most cases, a product is in a defective condition unreasonably dangerous to the consumer or user if:
>
> (1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger [Bifolck 1]; or
>
> (2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product [Bifolck 2].

*Fajardo*, 341 Conn. at 535, 267 A.3d at 706–07 (quoting *Bifolck*, 324

Conn. at 434-35).

In *Fajardo*, the Court further explained that "expert testimony is required in a reasonable alternative design case when the evidence regarding the defect and whether the alternative was feasible (technically and economically) and whether the alternative would have reduced or avoided the risk of harm is beyond the ken of the average juror. 341 Conn. at 566–67.

> [Conversely] [t]he trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters. ... Whether expert testimony is required in a particular case is determined on a case-by-case basis and its necessity is dependent on whether the issues are of sufficient complexity to warrant the use of the testimony as assistance to the ... [trier of fact].

*Bagley v. Adel Wiggins Group*, 327 Conn. 89, 103, 171 A.3d 432, 441 (2017) (citation and quotation marks omitted). In addition, the Connecticut Supreme Court has recognized that "pointing to an existing product that has been successfully commercialized can serve as evidence of the feasibility of an alternative design . . .." *Fajardo*, 341 Conn. at 577.

In this case, Mr. Cleaveland, through his counsel, disclosed an

30

expert to testify that the defendants' Gorilla-brand ladder was in a defective condition unreasonably dangerous to the consumer or user at the time it was sold. In response to criticisms leveled by the defendants' liability expert, counsel for Mr. Cleaveland sought to supplement that disclosure with a report including test results, calculations and other material the district court judge ultimately found were necessary to the admissibility of the expert's testimony and to survival of the claim. Although the case was barely one year old and had no history of delay, the district court erred in entered what it determined to be an outcome-determinative denial of leave to file the supplemental report, without consideration of any alternative other than a continuance of the trial that had not yet been scheduled, and by rejecting that alternative without any basis.

Confirming its view that the decision to deny supplementation of Dr. Slocum's report was outcome-determinitive, the district court then preclude the entire testimony of the expert as inadequate without that supplementation. Yet, the district court opinion misstates and minimizes the nature and extent of the expert's analysis, and fails to recognize the contributions of the expert engineer's experience and

31

knowledge regarding mechanical failures and the forces at work on the subject ladder. The district court further precluded the expert's testimony regarding an alternative design found in an existing product, which was adequate in its own right to raise a question of fact requiring a jury trial.

Finally, the district court failed to recognize that, under applicable Connecticut law as summarized above, Mr. Cleaveland does not need expert testimony to raise a genuine issue of material fact requiring a trial. The district court erred in granting summary judgment for the defendants due to the absence of the expert testimony it had wrongly excluded.

The district court's rulings were harmful and deprive Mr. Cleaveland of a hearing on the merits of his claim.

## ARGUMENT

I.    Because the exclusion of Dr. Slocum's testimony without supplementation was outcome-determinative and the district court did not adequately consider alternatives, the order denying the Motion for Permission to File Supplemental Expert's Report is not justified.

In *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,

694 F.3d 155 (2d Cir. 2012), the plaintiff missed its deadline for disclosure of experts. The district court judge responded by striking the plaintiff's late-disclosed expert. The appellate court reversed.

Recognizing that the district court generally has wide discretion in enforcing discovery orders, the appellate court nevertheless concluded that because this order was "akin to dismissing the action altogether", the standard applicable to review of the order was the same standard applicable to dismissal of the case. *World Wide Polymers*, 694 F.3d at 160. Accord *Pichardo v. C.R. Bard, Inc.*, 563 F. App'x 58, 61 (2d Cir. 2014) ("While the court's order of dismissal took the form of a grant of summary judgment based on Pichardo's failure to produce evidence showing a triable issue of fact, in substance, the district court's ruling was in the nature of a dismissal as a sanction for failing to adhere to the district court's scheduling order.").

In considering a discovery order that may be outcome determinative, the non-exclusive factors to be considered are "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of

33

noncompliance; and (4) whether the non-compliant party had been warned of the consequences of ... noncompliance." *World Wide Polymers*, 694 F.3d at 160. The court concluded that a mistake by counsel that did not seek an unfair advantage does not warrant so drastic a sanction against the plaintiff. In the absence of findings or analysis by the district court as to why the first sanction meted out was one of the most severe possible, the appellate court concluded that the order excluding the testimony could not stand. Id. Accord *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988) ("Because the evidence of these witnesses was so important, only extreme misconduct on the part of the plaintiff or extreme prejudice suffered by the defendants would justify the extraordinary sanction of preclusion in this case.").

In this case, the district court recognized that the Rebuttal Report was necessary for Dr. Slocum to testify fully and completely and to properly respond to cross examination, and that "Dr. Slocum's supplemental report appears to address issues that require expert testimony and are central to the case." Order. Despite that recognition, the district court used the wrong test to assess the request to

34

supplement the expert's opinions. Where, as the district court found in this case, expert testimony is necessary to support a product liability claim, the test applied by the district court does not adequately consider the efficacy of a lesser sanction in responding to the late disclosure of the expert testimony.

> Dismissal " 'is a drastic remedy that should be imposed only in extreme circumstances,' ... usually after consideration of alternative, less drastic sanctions." *John B. Hull*, 845 F.2d at 1176 (quoting *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir.1986)). Finally, "[i]n deciding on the suitability of lesser sanctions, and whether the sanctions should be aimed primarily against the party or the attorney, it can be important for the district court to assess the relative roles of attorney and client in causing the delay, as well as whether a tactical benefit was sought by the [misconduct]." *Dodson v. Runyon*, 86 F.3d 37, 40 (2d Cir.1996).

World Wide Polymers, 694 F.3d at 160. Accord *Byrne v. Comm'r*, 509 F. App'x 33, 34 (2d Cir. 2013); *Outley*, 837 F.2d at 591 ("Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses.").

In this case, the district court did not fault plaintiff's counsel's timeliness in seeking to supplement Dr. Slocum's report or suggest that

35

counsel was attempting to gain some sort of litigation advantage in the timing of the supplemental disclosure. To the contrary, the sole fault raised by the district court was a failure adequately to communicate and file an earlier motion. Counsel for Mr. Cleaveland recognizes the importance of such communication, beyond the notice placed in the joint status report, but nevertheless submits that there is no basis for concluding that the late disclosure involved any fault on the part of Mr. Cleaveland at all, or that the late disclosure was pursued for some sort of litigation advantage.

Moreover, as to the possibility of a lesser sanction, the district court's analysis was limited to consideration of a continuance, which the district court rejected because it would have necessitated a brief delay in a trial date that had not yet been set. This finding is unjustifiably harsh. Compared to the plaintiff's loss of a potentially viable claim, and in the absence of consideration of other potential response to the late disclosure, the district court's analysis is insufficient in the circumstances of this case.  The district court did not attempt to explain why a continuance could not have been granted. Nor did the district court consider the possibility of any sanction less that

preclusion.

The district court had the opportunity to recognize and correct this error in connection with its consideration of the motion for summary judgment. Mr. Cleaveland submitted an affidavit of Dr. Slocum with his opposition to the motion, including some of the contents of his Rebuttal Report. As part of the same Ruling in which the district court granted summary judgment due to the absence of expert testimony, the district court refused to consider those portions of that affidavit. SA 20-22.

Even when exclusion of testimony is not outcome-determinative, the discretion of the District Court is not unlimited, and this court has a vital role to play in overseeing the exercise of discretion to assure a rational result. *United States v. Robinson*, 544 F.2d 611, 616 n.6 (2d Cir. 1976), on reh'g, 560 F.2d 507 (2d Cir. 1977). The loss of Mr. Cleaveland's claim in the circumstances of this action is not a rational result.

The exclusion of the Rebuttal Report of Dr. Slocum was harmful. The district court expressly refused to consider any aspect of the

Rebuttal Report in its decision to exclude the testimony of Dr. Slocum or in its decision to grant summary judgment for the defendants. The Rebuttal Report expressly addressed the issues upon which the district court relied in excluding Dr. Slocum's testimony. The Rebuttal Report includes Dr. Slocum's calculations supporting his free body diagram showing the forces on the ladder, as well as the results of his test to validate his opinions regarding the stress in the area of the ladder's failure. The district court recognized that the Rebuttal Report contained information responsive to the court's concerns. As a whole, including the Rebuttal Report, Dr. Slocum's expert opinions were admissible and created a genuine issue of material fact for consideration by a jury.

Finally, Federal Rule of Civil Procedure 26(e)(1) addresses the anticipated need to supplement expert reports and should be interpreted to permit amplification and explanation for previously disclosed opinions. Dr. Slocum's Rebuttal Report was not offering completely new opinions or analysis. He was, in good faith, expanding upon his initial report and responding to the unwarranted criticism of that report by the defendant's expert.

38

Respectfully, the trial court erred in denying Mr. Cleaveland's motion for permission to file supplemental expert's report of Dr. Slocum, and that harmful error requires reversal of the district court's judgment.

II.    Because Dr. Slocum employed a reliable methodology and that methodology was properly applied to the facts of this case, the order excluding his testimony in its entirety was not justified and must be reversed.

District court rulings will be upheld unless manifestly erroneous. When reviewing a district court's decision to admit evidence, "[e]ither an error of law or a clear error of fact may constitute an abuse of discretion." *Abascal v. Fleckenstein*, 820 F.3d 561, 564 (2d Cir. 2016) (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir.1999)) (internal quotation omitted). Accord *United States v. Conde*, 134 F.4th 82, 87 (2d Cir. 2025) (abuse of discretion standard "allows reversal for an error of law or a clear error of fact" in addition to a decision that cannot be located within the range of permissible decisions).

As to the admissibility of expert testimony, Federal Rule of Evidence 702 provides:

39

> **If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), established that district court judges perform a gatekeeper function to ensure that only reliable and relevant expert testimony is permitted. The gatekeeper function of a district court applies to all forms of testimony potentially admissible under Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999). However, the specific factors mentioned in *Daubert*, which dealt with scientific evidence, may or may not be helpful in analyzing the admissibility of engineering or other types of expert testimony. *Kumho Tire*, 526 U.S. at 150-51. An engineer's "background and practical experience" qualify as "specialized knowledge" gained through "experience, training, or education" within the meaning of Fed. R. Evid. 702. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

A.    **The District Court erred in holding that Dr. Slocum's methodology for investigating the accident cause and the reliability of his**

opinions were insufficient.

Initially, the district court judge was critical of Dr. Slocum's methodology, describing it as visual inspection alone and suggesting that there is no evidence that visual inspection alone is a reliable methodology for assessing the causes of ladder accidents. There are several problems with the district court's approach.

First, Dr. Slocum states that his investigation followed the scientific method as outlined in Chapter 4 of NFPA 921. Although NFPA 921 is a guide for fire and explosion investigation, Chapter 4 set forth a basic statement of the scientific method that is universally applicable. As summarized by one court,

> Chapter 4 of the NFPA 921 sets forth the basic methodology to employ when conducting a fire investigation. (Docket No. 23, Ex. J, 3). Section 4.3 provides the following steps to apply: 1) recognize the need (identify the problem); 2) define the problem; 3) collect the data; 4) analyze the data (inductive reasoning); 5) develop a hypothesis; and 6) test the hypothesis (deductive reasoning). Id. Specifically, § 4.3.6 of NFPA 921 provides as follows:
>
> > Test the Hypothesis (Deductive reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her

41

> hypothesis to all known facts. (See 3.3.35, Deductive Reasoning.) This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data. This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

*Kozar v. Sharp Elecs. Corp.*, No. CIV.A. 04-901, 2005 WL 2456227, at *2 (W.D. Pa. Sept. 30, 2005); *Allstate Ins. Co. v. Gonyo*, No. CIV 807-CV-1011 RFT, 2009 WL 1212481, at *6 (N.D.N.Y. Apr. 30, 2009) ("NFPA 921's goal is to provide guidance to the investigators which is based upon accepted scientific principles.").

Dr. Slocum's Preliminary Report follows this model. After identifying the ladder failure and summarizing the information available to him, he describes that he did in fact do a visual inspection of the failed ladder, but also did significantly more than that. Initially, he analyzed the location of the failure, using his experience to observe that the "smooth wavy shape of the bent metal around the pin point is indicative of plate bucking of the thin-walled aluminum extrusion that

42

forms the rail." JA 107 (¶1). He purchased an exemplar ladder and used it to compare with the incident ladder. He measured the critical components of the ladder, noting that "the height of the extrusion is about 1.5" so the height/wall thickness ratio is about 40:1", again using his experience to conclude that this means the "plate-like sections that form the walls of the rail may be prone to buckling failure . . . and sensitive to deformation from a drilling or riveting operation if great care is not taken." JA 108 (¶2). He provided a photograph documenting that very condition in another section of the ladder. Id.

Dr. Slocum tested his hypothesis through deductive reasoning. More specifically, he explained how the ladder works and, importantly, how the design of this ladder differs from regular step ladders. JA 109-10 (¶3). Where regular step ladder do not apply a significant side load, the spreader link and bottom step of this ladder apply a side load to the front and rear rails. Id. He used other photographs to compare uniform compression plate buckling with the localized plate buckling of the rear rail extrusion in the subject ladder, to demonstrate that a side load must have been applied on the pin join of the rear rail, where the outside face was in tension, and the inside face was in compression and

43

buckled. Id, (¶4). He describes that the design of this ladder, as compared to a regular step ladder, is inherently prone to failure due to the enhanced side loads that can exceed capacity when combined with normal manufacturing tolerances, which is exacerbated by the creation of a torsion due to eccentric loading. All of this puts stress on the hole for the pin-joint on the rear rail, which should have been reinforced. Id.

In short, Dr. Slocum employed a reliable approach to investigating the cause of this loss.

The district court judge further found too great an analytical gap between Dr. Slocum's data and his opinions. The district court wrote that, "There is neither explanation, nor any form of testing, to demonstrate why the deformity at the 'rear-left rail extrusion that the spreader-link pin-joint passes through' can be problematic." SA 16. But this is clearly mistaken. Dr. Slocum's Preliminary Report explains that deformation of the spreader link, when combined with the other forces acting on the ladder, cause a side load on the rear rail, a design that is inherently prone to failure. JA 109 (¶4). He provided a photograph showing the manufacturing tolerance for the pin-joint hole that would contribute to failure. Id. Dr. Slocum did not need to perform any

44

physical tests to demonstrate the side and eccentric loading of the subject ladder; he demonstrated it through his analysis and photographs.

And where, as here Dr. Slocum identified the weak point of the ladder that failed, and the reason for its failure, his conclusion that this area of the ladder should have been reinforced and that such reinforcement would likely have prevented this accident is not speculation, it is reasoned analysis. Contrary to the district court's analysis, Dr. Slocum did not fail to undertake testing of "his theory of causation"; he accepted Mr. Cleaveland's description of the accident as data and found it consistent with his analysis of the ladder.

The district court judge repeatedly mentioned that Dr. Slocum had not run tests to support his Preliminary Report. There is no such requirement for the admissibility of his testimony.

> [A]n expert may rely on data that she did not personally collect. The Federal Rules of Evidence specifically provide that an expert may rely on facts or data "perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703 (emphasis added). The expert need not have conducted her own tests.

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000).

45

Here, Dr. Slocum relied on his knowledge of stress failures and used photographs to demonstrate the nature of the failure of the subject ladder. He did not need testing or calculations to demonstrate how the forces were acting on the ladder or the nature of the failure that resulted; he employed his observation, measurements, analysis, reference to existing failure documentation, and his experience and education to explain the forces at work and their effect leading to failure of a vulnerable weakness inherent in the design of this ladder.

The district court opinion misstates and minimizes the nature and extent of Dr. Slocum's analysis. The district court failed to recognize the contributions of Dr. Slocum's experience and knowledge regarding mechanical failures and the forces at work on the subject ladder. The district court's order excluding Dr. Slocum from testifying about the cause of the accident was manifestly erroneous and should be reversed.

B.    Putting aside the admissibility of Dr. Slocum's opinion regarding the cause of the accident, there was no basis for the district court's order precluding Dr. Slocum's testimony in its entirety, where some of that disclosed testimony was adequate on the question of reasonable alternative design.

Without regard to all other criticism of Dr. Slocum's opinions,

46

there was no basis for excluding Dr. Slocum's testimony contrasting the subject ladder with a regular step ladder. That testimony in itself would have been sufficient to create a jury question defeating the defendants' motion for summary judgment.

In paragraph 3 of his Preliminary Report, Dr. Slocum contrasted the design of the Gorilla-brand ladder marketed by the defendants and a regular step ladder. As Dr. Slocum explained, when the Gorilla-brand ladder is opened for use, the top and bottom steps rotate from their stored position until the top step hits a horizontal brace. The top step is connected to the bottom step by a connecting link, and the bottom step acts as a spreader link, transferring a part of the load, when a person is on the ladder, through the horizontal brace to the side rails. Dr. Slocum observed that "Regular step ladders do not have this significant side load on the rails as the steps are usually fixed to the front rails and independent of the spreader links." JA 109. The subject Gorilla ladder suffered a failure in the rail near the spreader link.

Although Dr. Slocum went further and suggested that a modification of the Gorilla ladder design, through reinforcement of the pin-joint area of the linkage connection to the rails, could have

47

accommodated the increased side loads created by the linkage connection, his underlying point was that the Gorilla ladder's design was different from that of a standard step ladder, which does not have a linkage connection at all. The district court concluded that Dr. Slocum's testimony regarding reinforcement of the pin-joint area of the linkage connection had inadequate support. But that conclusion does not justify exclusion of the entirety of Dr. Slocum's disclosed testimony, including his comparison of the Gorilla ladder's design with that of a regular step ladder. Exclusion of part of an expert's testimony does not mean that other, admissible parts, must be excluded. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016).

In ruling on the defendants' Motion for Summary Judgment, the district court refused to consider Dr. Slocum's affidavit, mirroring paragraph 3 of his Preliminary Report, comparing the Gorilla ladder's design with that of a standard step ladder and concluding that "Regular step ladders do not have this additional side load on the rails as the steps are usually fixed to the front rails and decoupled from the spreader links." JA 241-42 (¶13).

As set forth by the Connecticut Supreme Court, the *Bifolck I* version of the risk-utility test, which will govern most cases, permits a jury to find that a product is in a defective condition unreasonably dangerous to the consumer or user if a reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. Under this test, the jury "must" consider the feasibility of the alternative; Dr. Slocum's anticipated testimony establishes that a regular step ladder is a reasonable and feasible alternative design. Exclusion of this portion of his testimony was improper and harmful.

The district court in this case alternatively held that Mr. Cleaveland's proof was insufficient under this aspect of the risk-utility test because Mr. Cleaveland did not present evidence, through Dr. Slocum or otherwise, of other potentially relevant factors. But in *Bifolck*, the Connecticut Supreme Court did not hold that a jury must consider other factors. To the contrary, the Bifolck Court held that "[o]ther relevant factors that a jury *may* consider include, but are not

49

limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger." (emphasis added).  There is no requirement that a jury consider other factors and no basis for granting summary judgment against Mr. Cleaveland because he did not present evidence as to them.

Even assuming the district court properly excluded portions of Dr. Slocum's testimony, the district court erred in excluding the entirety of Dr. Slocum's testimony and that error was harmful.

III.    Because Mr. Cleaveland provided a sufficient basis for a jury to find in his favor, the District Court erred in granting summary judgment in favor of the defendants.

A district court's order granting summary judgment is subject to *de novo* review on appeal. *Proctor v. LeClaire*, 846 F.3d 597, 607 (2d Cir. 2017).

Even assuming that the district court did not err in refusing to allow Mr. Cleaveland to supplement his expert's report and then

50

excluding the entirety of the expert's testimony, the court should have

denied the defendants' motion for summary judgment based on

application of the consumer expectation test. Although the risk-utility

test is the default standard under Connecticut law, both tests can be

applied in any given case, based on the available evidence; they are not

mutually exclusive. *Izzarelli*, 321 Conn. at 201, 136 A.3d at 1248;

*Bifolck,* 324 Conn. at 436 n.19, 152 A.3d at 1203 ("We do not foreclose,

however, the possibility that a plaintiff could proceed under the

consumer expectation test with direct evidence of a defect that does not

require expert testimony should a case arise in which it would be

inappropriate to require the plaintiff to proceed under the risk-utility

test.").

> Under the consumer expectation test, our secondary test, a
> product is in a defective condition unreasonably dangerous
> to the consumer or user only if it is "dangerous to an extent
> beyond that which would be contemplated by the ordinary
> consumer who purchases it, with the ordinary knowledge
> common to the community as to its characteristics." 2
> Restatement (Second), supra, § 402A, comment (I), p. 352.
> The product must fail to meet legitimate, commonly held,
> minimum safety expectations of that product when used in
> an intended or reasonably foreseeable manner. Those
> expectations may be informed by consumers' experience
> with the product, the seller's express representations, and

51

product safety laws.

*Bifolck*, 324 Conn. at 436, 152 A.3d at 1203. In other words,

> a defect may be established under our consumer expectation test by proof of the product's noncompliance with . . . a product seller's express representations. Such noncompliance would establish the product's failure to meet consumers' legitimate, commonly accepted, minimum safety expectations. Moreover, the utility of the product would not excuse such noncompliance.

*Bifolck*, 324 Conn. at 433, 152 A.3d at 1202.

In this case, Mr. Cleaveland presented evidence that he used the ladder properly. He placed it on a flat surface and climbed to one of the established platform steps. Although the defendants suggest credibility issues with Mr. Cleaveland's account, credibility presents an issue of fact that cannot be decided by a judge in the context of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986); *Proctor*, 846 F.3d at 608.

The evidence further established that the sellers expressly warranted that the ladder could sustain weight up to 300 lbs. and that Mr. Cleaveland, who is a large individual experienced with ladders, purposely bought this ladder because of that express representation.

Accepting the facts, and all reasonable inferences flowing from them, as presented by Mr. Cleaveland, as the district court was obliged to do; see, e.g., *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021); the Gorilla-brand ladder did not comply with the sellers' express representations by failing to hold Mr. Cleaveland's weight while he was properly using it.

Under Connecticut law, where a product fails to meet a consumer's legitimate, commonly accepted minimum safety expectations, based upon the product's noncompliance with a product seller's express representations, expert testimony on product design is not needed to prove the product's defect, nor is the utility of the product's design an excuse for the undisclosed defect. *Izzarelli*, 321 Conn. 202–03, 136 A.3d at 1249. The district court therefore erred in granting summary judgment to the defendants under the facts presented.

## CONCLUSION

For the foregoing reasons, the plaintiff Joshua Cleaveland

53

respectfully maintains that the district court erred in its rulings (1) denying Mr. Cleaveland the opportunity to supplement his expert report, (2) excluding the expert's testimony in its entirety, and/or (3) granting the defendants' motion for summary judgment. Because the district court's errors were harmful to Mr. Cleaveland and completely deprived him of his day in court, the district court's rulings should be reversed, and this case should be remanded for further proceedings, including a trial.

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Century Schoolbook proportional font and contains 10410 words as determined by WordPerfect, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rule of Appellate Procedure, and thus complies with the typeface, typestyle, and type-volume requirements set forth in Rule 32(a)(5)-(7)(B) of the Federal Rules of Appellate Procedure.

*/s/Jack G. Steigelfest*
Jack G. Steigelfest

October 21, 2025

# UNPUBLISHED
# CASES

**Allstate Ins. Co. v. Gonyo, No. CIV 807-CV-1011 RFT, 2009 WL 1212481 (N.D.N.Y. Apr. 30, 2009)**

**Kozar v. Sharp Elecs. Corp., No. CIV.A. 04-901, 2005 WL 2456227 (W.D. Pa. Sept. 30, 2005)**

55

2009 WL 1212481
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

ALLSTATE INSURANCE COMPANY as
subrogee of Thomas Lothridge, Plaintiff,
v.
Albert GONYO,[2] Defendant.

Civ.No. 8:07–CV–1011 (RFT)[1].
|
April 30, 2009.

**Attorneys and Law Firms**

Cozen, O'Connor Law Firm, Daniel J. Luccaro, Esq., of Counsel, Philadelphia, PA, for Plaintiff.

Office of Daniel W. Coffey, Daniel W. Coffey, Esq., of Counsel, Albany, NY, for Defendant.

### *MEMORANDUM DECISION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** In this fire subrogation action, on September 12, 2008, Allstate Insurance Company (Allstate) filed a Motion *in Limine* to Preclude the Expert Testimony of George Hanslmaier. Dkt. Nos. 39–41 .[3] Gonyo opposes Allstate's Motion *in Liminie.* Dkt. Nos. 42 & 43.[4] In the interim, Gonyo filed a Motion for Summary Judgment and on April 8, 2009, this Court issued a Memorandum–Decision and Order denying Gonyo's Motion. Dkt. No. 52. For the reasons that follow, Allstate's Motion *in Liminie* is **denied.**

### I. BACKGROUND

The parties' familiarity with the facts are presumed. *Id.* at pp. 2–6. Nonetheless, a brief recitation of the facts are warranted.

On November 14, 2006, Albert Gonyo and Charles Stone rented Thomas Lothridge's cabin, which is located in the Town of New Berlin, Chenango County, as they had done on multiple occasions in the past. Prior to pursuing hunting, Gonyo lit a fire in the wood burning stove while Stone assisted by bringing in the wood. After the stove was lit, Gonyo and Stone left the cabin for approximately forty-five (45) minutes to scout for deer. Upon their return to the cabin, they observed black smoke billowing from the cabin. Later, as they looked through the cabin's windows, they could see the inside engulfed in flames.

Within eleven (11) minutes of the alarm, the New Berlin Fire Department was the first fire company to respond and on that first truck was the Fire Chief George Hanslmaier. Other fire companies also arrived and assisted in the containment of the fire. Chiefly among those other fire companies, was the Chenango County Fire Cause and Origin Team ("CCFCOT"). At all times during the management of the fire, Fire Chief Hanslmaier was the senior officer, and because of his superior rank, as a matter of policy, he was the fire and origin investigator. Hanslmaier has served his fire company for twenty-five (25) years, moved up the ranks, and has served as Fire Chief for approximately ten (10) years prior to this fire. In addition, Hanslmaier was a Level One Certified Fire Investigator.

Once the fire was extinguished, and as the highest ranking official at the fire scene, Hanslmaier conducted a fire scene origin and cause investigation, of which Gonyo and Stone witnessed. Based upon his observations, and after conferring with others, Hanslmaier concluded that the fire began due to the heat from the chimney which ignited the roof. He further opined that further damage was caused by "drop down" debris from the roof. Upon returning to his fire station, Hanslmaier typed up a report. Dkt. No. 41–4.

Allstate retained the services of Dennis A. Ware to investigate the cause and origin of the fire, and, on November 17, 2005, Ware inspected the fire scene. During his inspection, Ware observed the outline of the purported remains of a plastic tool chest, which was sitting approximately six (6) inches from the wood burning stove. Based upon his investigation, Ware opined that the fire did not start in the roof line but rather in the northeast corner of the living room by the stove, attributing the ignition of the fire 'to the failure of the persons who were using the wood stove to maintain proper clearance to combustibles (the plastic toolbox) located close to the wood stove[.]" Dkt. No. 41–2 at p. 7. Immediately thereafter, Ware reported his conclusion to Allstate and, on April 12, 2006, Gonyo received a letter advising him that the fire was the result of his negligence.

**\*2** By this Motion, Allstate contends that Hanslmaier's testimony should not be admitted at trial because it would fail to comport with the standards set forth in FED.R.EVID. 702 and *Daubert v. Merrill–Dow, Pharm. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In this respect, Allstate attacks Hanslmaier's qualifications as a cause and origin investigator and his opinions as unreliable. As an ancillary issue, Allstate asserts that Hanslmaier's opinion is not his own but actually that of unknown members of the CCFCOT. In support of these challenges to Hanslmaier testifying, Allstate levies a litany of objections.

Turning first to the challenges of Hanslmaier's qualifications, Allstate starts by minimizing his certification as a Level I Fire Investigator. Allstate notes that he had not obtained a Level II Certification nor attempted to do so; he has no other certification relating to fire cause and origin investigation nor was he a member of the CCFCOT; and Hanslmaier has never been retained as an expert witness nor given a deposition or testimony in his capacity as Fire Chief or fire cause and origin investigator.

In terms of his opinion, which Allstate maintains is unreliable, its first shot over the bow is that it is not his independent opinion but a group decision. Allstate states that Hanslmaier did not follow the National Fire Protection Association (NFPA) standards, which provide guidance for fire and explosive investigations. In this regard, Allstate notes that Hanslmaier did not take any photographs, personally interview witnesses, particularly Gonyo and Stone, conduct a further investigation, nor test his theory as to the origin of the fire as recommended by the NFPA. In Allstate's view, Hanslmaier's conclusion is based upon his inspection of the fire scene, which in and of itself is insufficient. Further compounding its attack on his opinion, Allstate raises that Hanslmaier does not have an opinion regarding how the fire spread from the roof area to the other portions of the cabin.

## II. DISCUSSION

*A. The Applicable Standard*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The statute reads

> [i]f scientific, technical, or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Basically, there are two prerequisites: (1) that the witness be qualified as an expert in scientific, technical or specialized matters, *see* *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997); and (2) the expert's testimony will assist the trier of the facts in understanding the evidence or determining a fact in issue, *see* *United States v. One Parcel of Property Located at 31–33 York Street,* 930 F.2d 139, 141 (2d Cir.1991). Moreover, Rule 702 delegates to the court a "gatekeeping" function, which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" *Daubert,* 509 U.S. at 592–93. What is required is that the testimony must be relevant and reliable. *Id.* at 589–91 & 597 ("[A]n expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). This two prong inquiry applies to all scientific, technical, and specialized knowledged testimony equally. *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The admissibility of the expert's testimony, that is, whether the testimony is relevant and reliable, resides with the proponent of the testimony and his burden of proof is by the preponderance of evidence. *Boujaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987; *Daubert,* 509 U.S. at 592–93 n. 10; *see also* FED.R.EVID. 104(a).

**\*3** As to the first prong of the gatekeeper's fundamental task, *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), in order to determine if expert testimony will assist the trier of fact, courts need not look any further than Rules 401 and 402 to determine if the matter

is relevant. [5] " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401; *Royal Ins. Co. of Am. v. Joseph Daniel Const.,* 208 F.Supp.2d 423, 428 (S.D.N.Y.2002) (noting that it is a "direct relationship" between an issue and the evidence). Therefore, in order for evidence or testimony to be relevant, it must relate to an issue in the case or be sufficiently pertinent to a material fact in the case. *Daubert,* 509 U.S. at 591. This relevancy consideration as been "aptly described as one of fit." *Id.* "[T]he expert's testimony will ... fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *Hackert v. First Alert, Inc.,* 2005 WL 6021862, at *2 (N.D.N.Y. June 14, 2005) (citing, *inter alia, Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997)) (quotation marks and alteration in original).

In assessing the reliability of a proffered expert's testimony, the Supreme Court in *Daubert* provided a list of non-exclusive factors that a trial court should consider: (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 592–95. But this is not a definitive checklist of factors because the test of reliability is a flexible one. *Kumho,* 526 U .S. at 158 (citing *Daubert,* 509 U.S. at 594); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (ruling that the courts are granted broad latitude). Since no single factor is dispositive as to reliability and not every *Daubert* factor can be applicable to every type of expert testimony, a court can consider one or more of those factors, or may even considered other factors to determine reliability. *Kumho Tires,* 526 U.S. at 141. [6] Depending on the particular case, the nature of the issues, and the particular expert testimony being proffered, a trial court should have sufficient leeway to determine what factors are more helpful in evaluating the reliability of the testimony. *Id.* at 142. [7] It is not the courts obligation "to weigh the correctness of an expert's opinion or to choose between conflicting opinions[.]" *Travelers Property & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d 360, 364 (D.Conn.2001). Nor must the courts "admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. at 146. [8] The testimony, whether based upon professional study or personal experience, must meet the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.

### B. Qualifications

**\*4** Initially, the Court must determine if Hanslmaier is qualified to testify regarding the origin of this fire. Allstate takes a dim view of Hanslmaier's qualifications. Allstate discounts his Level I Certificate as essentially meaningless and highlights Hanslamier's failure to obtain the Level II Certification. Compounding that failure, Allstate posits that Hanslmaier has no other certification relating to fire cause and origin investigation, has never testified in a deposition or trial in his capacity as Fire Chief, and has never been retained as an expert witness.

Hanslmaier has more than twenty-five (25) years experience as a volunteer fireman and has advanced through the ranks to become the Fire Chief for New Berlin. Dkt. No. 41–5, Hanslmaier Dep. at p. 9. As the Fire Chief for more than a decade, and not disregarding his duties and responsibilities in his other ranking positions, on the approximately sixteen (16) fires a year that New Berlin may have attended to, he was the most likely officer, by virtue of rank, to be assigned as the cause and origin investigator. *Id.* at pp. 11 & 55. He is also laboring under the belief that New York State requires the fire chief to determine the cause and origin, while the New Berlin Fire Depeartment's policy allows the top three ranking officers to lead the cause and origin team. *Id.* at p. 48. He was certified by New York State as a fire investigator (Level I) after attending the fire academy in Montour Falls, New York. *Id.* at p. 10. In order to qualify for a Level I Certificate, Hanslmaier was required to attend classes and perform thirty (30) hours of fire cause and origin determination. *Id.* at p. 10; N.Y. COMP.CODES R. & REGS. tit. 19 § 426.8(b). [9] After securing his Level I Certificate, Hanslmaier attended other fire seminars.

While Allstate may discount Hanslmaier's credentials, and we further note the patently obvious preeminence of a Level II certified fire investigator over a Level I, Allstate has not cited nor has this Court found any authority that supports the proposition that Level I certified officers are not competent to serve as a fire cause and origin investigator

or as an expert. Further, the Court will not ignore that Hanslmaier's expertise is derived by studying general cause and origin investigation principles, remaining familiar with them, and by his practical experience. Rule 702 expressly contemplates that an expert may be qualified on the basis of experience alone. FED.R.EVID. 702. Moreover, Hanslmaier has conducted investigations for his employer, New York Central Mutual Insurance Company, where he is employed as senior property examiner. Some of his examinations include fire damage. Hanslmaier's Dep. at p. 56. Weighing this record, the Court finds that Hanslmaier meets the qualifications threshold. However, Hanslmaier must also demonstrate how his personal experience accompanied by his Level I Certificate sufficiently lead to the conclusion he has reached regarding the fire's origin.

### C. Relevance and Reliability

**\*5** Simply put, it is incontrovertible that Hanslmaier's opinion as to the origin of this fire is relevant to this case, so the Court now turns to the element of reliability.

It is Allstate's position that Hanslmaier's opinion that the fire started in the roof line of the cabin is unreliable for several reasons: (1) such opinion is not his but rather the product of a group decision; and (2) he did not follow the National Fire Protection Association (NFPA) standards. In this regard, Hanslmaier did not take any photographs, conduct personal interviews of witnesses, conduct any further investigation, nor test his theory as to the origin of the fire; (3) he did not eliminate other possible origins for this fire and has no opinion as to how the fire spread from the roof area to the other portions of the cabin; and (4) his opinion appears to be contrary to Gonyo's observations. Not surprisingly, Gonyo gainsays each of these contentions.

Hanslamier is familiar with the NFPA standards, which were provided to him when attending the fire academy and a copy is available in the New Berlin Fire House, and he further testified at his deposition that he conducted his investigation in accordance with the guidelines. Hanslmaier Dep. at p. 32. He notes that NFPA requires an investigator to commence the investigation from the outside of the structure and then work towards the inside—going from the least burned area to the most burned area. *Id.* at p. 33. As his fire company arrived at the scene, Hanslamier observed flames on the eaves of the roof. *Id.* at p. 21. After the fire was extinguished, Hanslmaier, following NFPA's requirement, conducted his inspection of the cabin. He started on the outside of the cabin and did a three hundred and sixty degree inspection of the exterior before venturing into the interior. When inside, he performed another three hundred and sixty degree inspection. *Id.* at p. 23. He looked at the burned patterns and how the fire spread. *Id.* at p. 24. In his view, most of the damage was high up on the roof, rather than lower in the structure. If it had been lower, he opined that there would have been the classic V pattern, and there wasn't. *Id.* at pp. 25 & 29. Based upon his inspection and his reliance on "char, the burns patterns, the amount of fire damage and how the fire spread," he concluded that the fire was ignited by the stove pipes that lead into the roof. *Id.* at p. 24. He opined that the "chimney [was] getting too hot and causing [sic] the framing around it to ignite." *Id.* at p. 35. As he inspected the cabin, he saw a hole in the roof which indicated to him that "the hottest amount of heat was in [that] area." *Id.* For him, there was neither multiple points of origin nor visible signs of an accelerant. *Id.* at 31. In terms of the stove, Hanslmaier does not recall seeing any burnt plastic nearby. *Id.* at p. 49.

Allstate raises that when Gonyo and Stone returned to the cabin and observed the conflagration, Gonyo only saw flames in the interior of the cabin. Dkt. No. 41–8, Gonyo's Dep. at p. 29–30. If this was so, that the first persons arriving at the scene did not see flames emanating from the roof, Allstate opines that the fire could not have started in the roof, as Hanslmaier concludes. But Hanslmaier further opines that it is possible to have seen the flames inside the cabin first before the inferno was visible from the roof. As he noted, there could have been interior flames on the interior ceiling or even the roof's insulation prior to the flames breaking through the metal roofing, and because of the interior flames on the ceiling, there could have been "drop down" that could have ignited other furniture or items. Hamslmaier's Dep. at pp. 51–53 & 62. In this respect, Hanslmaier posits that "drop down" could have caused a "secondary V pattern." *Id.* at p. 63. Therefore, in Hanslmaier's view, it would have been reasonable to see flames in the interior first before it burned a hole through the metal roof, and this would support a theory on how the fire could have spread.

**\*6** Witnesses to the fire were interviewed. It appears that either Hanslmaier spoke with 'the two occupants" or someone else on his team did. *Id.* at pp. 30 & 46. However, no notes were taken of those interviews. *Id.* at p. 30. He also admitted that he did not take any pictures of his investigation nor draft any diagrams. *Id.* at p. 45. Even though others may have assisted Hanslmaier on his overall assessment and participated in the decision as to the origin of the fire, he was

responsible for typing up the report and is its sole author. *Id.* at p. 38 & 46.

"NFPA 921," Dkt. No. 41–10, is a peer review and is generally accepted in the fire community. *Royal Ins. Co. of Am. v. Joseph Daniel Const.,* 208 F.Supp.2d 423, 426 (S.D.N.Y.2002). NFPA 921's goal is to provide guidance to the investigators which is based upon accepted scientific principles. Dkt. No. 41–10 at p. 1. Chapter Four outlines a basic scientific methodology, a systematic approach to investigating fires. "With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together." *Id.* at p. 2. Such investigation requires an examination of the scene, interviewing witnesses, and testing the results. The empirical data collected, which is "based on observation or experience and is capable of being verified," is subject to an analysis premised upon inductive reasoning. *Id.* [10]

This Court has considered Hanslmaier's background and practical experience in acting as a cause and origin investigator. The record indicates that he has specialized knowledge through experience and training in order to render an opinion as to the origin of this fire. His opinion meets both the *Daubert* "fit" requirement and its threshold. Hanslmaier has demonstrated that his opinion is the product of the intellectual rigor demanded of a fire investigator and that he relied upon a proven methodology and principles. He has provided reasonable grounds for his conclusion that may assist the trier of fact to shift through the events of the fire. Although Hanslmaier may not have ardently and strictly followed each step of NFPA, these shortcomings will not be fatal to him testifying before the jury and having his opinion tested. He used an individually tailored investigative process which was basically consistent with NFPA. If there is any question that Hanslmaier did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack. *Royal Ins. Co. of Am. v. Joseph Daniel Const.,* 208 F.Supp.2d at 427–28; *Manoma Realty Mgmt. LLC v. Fed. Pacific Elec. Co.,* 2007 WL 2175947, at *4 (S.D.N.Y. July 27, 2007)* (noting that the question of credibility should not keep an expert testimony from being admitted). The same may hold true regarding the failure to take pictures and personally interview key witnesses, or his consideration of the opinions of others as to how the fire began. Indeed, the "Federal Rules of Evidence specifically provide that an expert

may rely on facts or data perceived by *or* made known to the expert .... [Thus,] [t]he expert need not conduct her own tests."

*Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94–95 (2d Cir.2000) (internal quotation marks and citations omitted) (emphasis in original); *Manoma Realty Mgmt. LLC v. Fed. Pacific Elec. Co.,* 2007 WL 2175947, at *6 (finding that Rule 703 does not preclude expert testimony simply because the expert has not personally been at the scene). Expert testimony should not be precluded just because the expert assumed facts not in evidence or did not interview a witness. *Daubert,* 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation."); *Seeley v. Hamilton Beach/ Proctor–Silex, Inc.,* 349 F.Supp.2d 381, 387 (N.D.N.Y.2004). What is critical is that Hanslmaier's theory is capable of being tested, *Travelers Property & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d at 366, and that test can occur within the crucible of cross examination.

**\*7** Now, these conclusions do not mean that Hanslmaier's opinions cannot be challenged by vigorous cross examination, the presentation of a contrary view of the fire scene and the fire's origin, and proper jury instructions. *Daubert,* 509 U.S. at 595. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Travelers Property & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d at 366 (citation omitted). A court's task is not supposed to decide the correctness of an expert's opinion nor choose between competing opinions. A court's scope of review is narrowly tailored as to whether the expert's opinion meets the *Daubert* threshold—is the testimony relevant and reliable. In actuality, most, if not all, of Allstate's objections go to the weight and not the admissibility of the proposed expert testimony. All of the areas of contention raised by Allstate, and there are many, are substantial and fertile and yet more appropriately and better suited to be scrutinized through the heat of the adversary system rather than for the Court to assume that function. *Ambrosini v. Labarraque,* 101 F.3d 129, 133– 35 (D.C.Cir.1996); *Travelers Property & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d at 366 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (citation omitted).

The Court is satisfied that Gonyo has met his burden insofar as Hanslmaier's opinion meets the *Daubert/Kumho* standards. There are sufficient facts and data to support the opinion. Hanslmaier has applied NFPA 921, a reliable and acceptable

methodology, albeit not completely. His testimony is the product of reliable principles and methods. Hence Hanslmaier will be permitted to offer his opinion as to the cause and origin of the cabin's fire, subject, of course, to cross examination. Accordingly, Allstate's Motion to Preclude Expert Testimony, Dkt. Nos. 39–41, is **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1212481

## Footnotes

2   Initially, Charles Stone was listed as a Defendant as well. On August 12, 2008, the parties filed a Stipulation of Discontinuance as to Mr. Stone, Dkt. No. 37, which was approved by this Court, Dkt. No. 38.

1   On July 25, 2008, the parties filed a Notice to Consent to the Exercise of Jurisdiction by a United States Magistrate Judge, Dkt. No. 34, and, on July 30, 2008, the Honorable Lawrence E. Kahn, Senior United States District Judge, referred and reassigned this case to this Court, Dkt. No. 35.

3   Allstate's Motion *in Limine* is comprised of the following:

| Dkt. No. 39 | Notice of Motion |
|---|---|
| Dkt. No. 40 Daniel J. Luccaro, Esq., Aff., dated Sept. 12, 2008 | |
| Dkt. No. 41 Pl.'s Mem. of Law | |
| Dkt. No. 41–2 to 41–10 Exs. A–I. | |

4   Gonyo's Opposition to Allstate's Motion is comprised of the following:

| Dkt. No. 42 | Daniel W. Coffey, Esq., Aff., dated Sept. 29, 2009 |
|---|---|
| Dkt. No. 43 | Def.'s Mem. of Law, dated Sept. 29, 2008, with Ex. A. |

5   Rule 402 succinctly states that

> [a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

> FED.R.EVID. 402.

6   For example, the advisory committee summarizes several other factors that may be considered by the trier of the fact in determining reliability:

> (1) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their own opinions expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being careful as he would be in his regular professional work outside

his paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED.R.EVID. 702 advisory comm. notes (2000 Amendment) (internal citations and quotation marks omitted).

7 "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." FED.R.EVID. 702 advisory comm. notes (2000 Amendment).

8 Conversely, if courts exclude any scientific testimony, it is not an abuse of discretion unless the exclusion is "manifestly erroneous." *Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 357 (2d Cir.2004).

9 A Level II Certificate requires an additional fifty (50) hours of fire investigation activity. N.Y. COMP.CODES R. & REQS. tit. 19 § 428(c).

10 The NFPA 921 is broken into subparagraphs that outline a six step process in which an investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. Dkt. No. 41–10 at p. 2.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Kozar v. Sharp Electronics Corp., Not Reported in F.Supp.2d (2005)

2005 WL 2456227
Only the Westlaw citation is currently available.
United States District Court,
W.D.Pennsylvania.

Steve KOZAR and Sherry Kozar, Plaintiffs,
v.
SHARP ELECTRONICS CORPORATION, Defendant.

No.CivA.04-901.
|
Sept.30,2005.

**Attorneys and Law Firms**

Chris Konzelmann, White and Williams, Philadelphia, PA, for Plaintiffs and Defendant.

Clem C. Trischler, Patrick J. Doheny, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Defendant.

*OPINION* and *ORDER OF COURT*

AMBROSE, Chief J.

**\*1** This case arises out of a fire that occurred at the residence of Steve and Sherry Kozar on July 8, 2003. Plaintiffs have employed two experts to discuss their theory that the cause and origin of the fire was the Sharp window air conditioning unit model AF-08CRL manufactured by Defendant, Sharp Electronics Corporation ("SEC"): Brian L. Gray, a cause and origin investigator, and Matthew Balmer, an electrical engineer. SEC has filed a Motion to Strike and a Motion seeking to preclude the expert testimony of Gray and Balmer based on ⚑*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. (Docket No. 18). A hearing on the same was held on August 22, 2005. After carefully considering the submissions of the parties and the evidence presented at the hearing, said Motion (Docket No. 18) is granted as more fully set forth below.

*ANALYSIS*

A. *THE* DAUBERT *STANDARD AND RULE 702*
In *Daubert,* the Supreme Court held that:

[f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

⚑*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1992). In the Third Circuit, the trial court's role as a "gatekeeper" announced in *Daubert* requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. ⚑*In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 741-42 (3d Cir.1994).

The second inquiry focuses upon methodology. [1] The inquiry into methodology is designed to ensure that an expert's opinions are based upon "methods and procedures of science' rather than on subjective belief or unsupported speculation." ⚑*Id.* at 742. Reliability is assessed by determining whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. *See* ⚑*Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 593-94 (D.N.J.2002). "Some courts also consider additional factors relevant in determining reliability, including: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation ...; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion ...; (iii)

whether the expert has adequately accounted for alternative explanations ...; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context ...; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert...." ⚑*Magistrini,* 180 F.Supp.2d at 594-95 (citations omitted).

 **\*2** The third requirement is that the expert's testimony "fits" the facts of the case. " 'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." *Id., citing,* ⚑*Paoli,* 35 F.3d at 743.

B. *NATIONAL FIRE PROTECTION ASSOCIATION ("NFPA") 921*

Both Gray and Balmer testified that NFPA 921, titled "Guide for Fire and Explosion Investigations," is the authoritative industry standard that should be followed when conducting cause and origin investigations. Chapter 4 of the NFPA 921 sets forth the basic methodology to employ when conducting a fire investigation. (Docket No. 23, Ex. J, 3). Section 4.3 provides the following steps to apply: 1) recognize the need (identify the problem); 2) define the problem; 3) collect the data; 4) analyze the data (inductive reasoning); 5) develop a hypothesis; and 6) test the hypothesis (deductive reasoning). *Id.* Specifically, § 4.3.6 of NFPA 921 provides as follows:

> Test the Hypothesis (Deductive reasoning). The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. (*See 3.3.35, Deductive Reasoning.)* This testing of the hypothesis may be either cognitive or experimental. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis should be tested. This test may include the collection of new data or the reanalysis of existing data. This process needs to be continued until

all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

Both Gray and Balmer purportedly followed this methodology. Since Gray's opinion relies on Balmer's opinions, I address SEC's Motion with regard to Balmer first.

C. *MATTHEW BALMER, ELECTRICAL ENGINEER*

Plaintiffs' theory of the case focuses on the air conditioner as the cause and origin of the fire. Balmer is an electrical engineer and not a cause and origin expert. (Tr. 106, 117). As a result, Plaintiff's counsel agreed at the hearing that Balmer is not competent to give the opinion that the cause and origin of the fire was the air conditioner. (Tr. 199). Consequently, Balmer is precluded from offering any cause and origin opinions.

Furthermore, with regard to the defect / malfunction of the air conditioner, Balmer could not give an opinion within a reasonable degree of engineering certainty. (Tr. 112-13, 168). Rather, he admitted that his engineering opinion was 'speculative." (Tr. 160-68). The *Daubert* inquiry into methodology is designed to ensure that an expert's opinions are based upon " 'methods and procedures of science' rather than on subjective belief or unsupported speculation."

⚑*In re Paoli R.R. Yard PCB Litigation,* 35 F.3d at 742. Since Balmer's engineering opinions regarding the defect / malfunction of the air conditioner are based on speculation, I find that such engineering opinions must be precluded under *Daubert.*

D. *BRIAN L. GRAY, CAUSE AND ORIGIN INVESTIGATOR*

 **\*3** The six step of the basic methodology to employ when conducting a fire investigation is to test the hypothesis. Gray's report states:

> Electrical engineer Mathew (sic) Balmer examined all of the evidential items identified that were retrieved from the loss site. Through his examination of the physical evidence it was determined that the fire originated in the Sharp window

air conditioner, as was caused by a failure within the air conditioner.

(Docket No. 23, Ex. J, 2 p. 6).[2] In essence, Gray's report adopts the cause and origin opinion of Balmer.

SEC's first attack of Gray's opinion as to the cause and origin of the fire is that Gray relies solely on Balmer's cause and origin opinion to reach his opinion on cause and origin. At the hearing Gray testified that he did not perform any testing on the items recovered from the fire. (Tr. 83). Rather, he testified that he relied "solely and entirely" on Balmer's opinions to arrive at conclusions regarding the cause and origin of the fire. Since I am precluding Balmer's opinions, Gray's reliance on the same is fatal.

At the hearing, Plaintiffs' counsel tries to rehabilitate Gray by arguing that he conducted cognitive testing in compliance with NFPA 921 § 4.3.6. (Tr. 28). While § 4.3.6 allows for testing to be done either cognitively or experimentally, I am not persuaded by this argument. First, it is in conflict with Gray's testimony that he did not conduct any of the testing, but that the testing was performed by Balmer. (Tr. 83, 92-93). Second, Gray's own report states that the examination of the physical evidence was conducted by Balmer. (Docket No. 23, Ex. J, 2 p. 6). Gray's wholesale reliance on Balmer's cause and origin opinion, which has been precluded, together with his failure to conduct any testing, impugns the reliability of his opinion. Consequently, Gray's cause and origin opinion must be excluded.

Even if I did not exclude Gray's opinion based on the reasons above, I would still exclude his testimony for failure to comply with NFPA 921. First, NFPA 921 states that in determining the cause of the fire, the investigator must identify, *inter alia,* the appliance, the presence of a competent ignition source, the type and form of the material first ignited, and the failures...." (Docket No. 23, Ex. J, 3 NFPA 921 § 18.1.2). Gray never identified an ignition source in the air conditioner. (Tr. 46). Instead, Gray relies solely on Balmer's conclusions, and Balmer, even if permitted to testify, cannot testify to a reasonable degree of engineering certainty that the ignition source was a loose connection or the insulation. (Tr. 46, 112-113).

Second, NFPA 921 states that the determination of a cause of a fire "should be based on evidence rather than on the absence of evidence; however, when the origin of a fire is clearly defined, it is occasionally possible to make a credible determination regarding the cause of the fire, even when there is no physical evidence of the ignition source available. This finding may be accomplished through the credible elimination of all other potential ignition sources...." (Docket No. 23, Ex. J, 3 NFPA 921 § 18.2.1). "Elimination, which actually involves the developing, testing and rejection of alternate hypotheses, becomes more difficult as the degree of destruction in the compartment of origin increases, and it is not possible in many cases." (Docket No. 23, Ex. J, 3 NFPA 921 § 18.2.3). In this case, Gray was able to eliminate many possible ignition sources, but he was not able to eliminate them all. For example, at the time Gray issued his report on February 4, 2005, the only eyewitness testimony Gray had before him was the statement he originally took of Brittany Kozar.[3] At that time, Brittany Kozar stated that the fire was at the television and at the corner of the bed. (Tr. 50). Gray did not eliminate the television as the cause of the fire.

**\*4** Q. And what I want you to tell me, sir, is, is to answer this one question for me. Isn't it true that you cannot eliminate the television as a potential cause for this fire when the power cord was not recovered and could not be analyzed for signs of electrical activity.
A. I could not definitively rule that out, no.

(Tr. 95). As a result, according to NFPA 921 § 18.2, Gray may not use the process of elimination to determine the cause of the fire.

I am mindful that to survive a *Daubert* challenge, the expert opinion need not be devoid of all possible lines of attack. In reaching his conclusions, however, Gray neither applied the methodology recommended by NFPA 921, nor satisfied the requirements for expert testimony under *Daubert.* Consequently, Gray's testimony is precluded.

### ORDER OF COURT

And Now, this 30th day of September, 2005, after a review of the submissions of the parties, it is ordered that Sharp Electronics Corp.'s Motion to Strike and Motion to Preclude the Testimony of Brian L. Gray and Matthew Balmer (Docket No. 18) is granted. It is further ordered that Summary Judgment Motions are due on, October 20, 2005. Briefs in Opposition are due on, November 10, 2005.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2456227

---

**Footnotes**

1 Methodology has been defined as a "body of methods, rules and postulates employed by a discipline: a particular procedure [or] set of procedures." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 156 n. 20 (3d Cir.2000).

2 I note that I am not quite sure how Gray arrives at this conclusion on February 4, 2005, when Balmer's report was not issued until, at the earliest, February 28, 2005. Nevertheless, this is what his report states.

3 Brittany Kozar's deposition was conducted on February 21, 2005, after Gray's report was issued. Brittany Kozar testified at her deposition that she saw the fire being in the area of the bed and the windows where the air conditioner was, but not at the television. (Tr. 55); *See also,* Docket No. 23, Ex. F).

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.